1           IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF CALIFORNIA
2         BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

  UNITED STATES OF AMERICA,
4
              Plaintiff,
5   vs.                 Sacramento, California
                   No. 2:18-CR-00206
6   EDDY SANDOVAL LOPEZ,     Monday, October 26, 2020
                   11:19 a.m.
7               Defendant.
  _____/
8

9                    --oOo--

10          REPORTER'S TRANSCRIPT OF PROCEEDINGS

11            RE: JUDGMENT AND SENTENCING

12       *(Proceedings held via Zoom video conference.)*

13                  --oOo--

14   APPEARANCES:

15   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                     GRANT B. RABENN
16                    Assistant U.S. Attorney
                   501 I Street, Suite 10-100
17                    Sacramento, CA  95814

18   For the Defendant:        LAW OFFICE OF SAMUEL D. BERNS
                     SAMUEL D. BERNS
19                    Attorney at Law
                   5701 Lonetree Blvd., Suite 123
20                    Rocklin, CA  95765

21   Official Reporter:        KACY PARKER BARAJAS
                     CSR No. 10915, RMR, CRR, CRC
22                    UNITED STATES DISTRICT COURT
                   501 I Street, Suite 4-200
23                    Sacramento, CA  95814
                   kbarajas.csr@gmail.com
24

  *Proceedings recorded by mechanical stenography.  Transcript*
25 *produced by computer-aided transcription.*

1          SACRAMENTO, CALIFORNIA, MONDAY, OCTOBER 26, 2020, 11:19 AM

2                                  --oOo--

3          THE CLERK:  Calling criminal case 18-206,

4     United States versus Eddy Steven Sandoval-Lopez.  This is on

5     for judgment and sentencing.

6          THE COURT:  All right.  For the government.

7          MR. RABENN:  Good morning, your Honor.  This is

8     Grant Rabenn for the United States.  I hope you can see and

9     hear me.

10          THE COURT:  I can see and hear you, Mr. Rabenn.  Good

11     morning.

12          And for Mr. Sandoval Lopez.

13          MR. BERNS:  Good morning, your Honor.  This is

14     Sam Berns appearing for Mr. Sandoval Lopez.  Hopefully you can

15     see and hear me as well as Mr. Sandoval in a separate panel.

16          THE COURT:  I can see and hear you.

17          Mr. Sandoval, I can see you.  You can see and hear the

18     Court?

19          THE DEFENDANT:  Yes, your Honor.  I can see and hear

20     you well.

21          THE COURT:  Officer Slusarenko is present.

22          OFFICER SLUSARENKO:  Yes.  Good morning, your Honor.

23          THE COURT:  Is Mr. Sandoval prepared for sentencing

24     today, Mr. Berns?

25          MR. BERNS:  Yes, your Honor.

1      THE COURT:  And he's had a chance to fully review the

2  presentence report?

3      MR. BERNS:  Yes.  I've gone through that with him in

4  detail.

5      THE COURT:  All right.  I've reviewed that report and

6  the record of the case.  I have a defense sentencing memo which

7  I have reviewed.  I've reviewed the attachments to the PSR and

8  the defense memo.

9      I don't believe there's a government memo; is that

10  correct, Mr. Rabenn?

11      MR. RABENN:  That is correct, your Honor.

12      THE COURT:  All right.  As I said, I've reviewed your

13  statement, Mr. Sandoval.  Of course you'll have a chance to

14  address the Court before I make a final decision this morning.

15  So I'll let you know when that time comes.

16      THE DEFENDANT:  Thank you, your Honor.

17      THE COURT:  There are no objections to the guidelines

18  calculation or otherwise to the presentence report, correct,

19  Mr. Rabenn?

20      MR. RABENN:  That is correct, your Honor.

21      THE COURT:  Mr. Berns?

22      MR. BERNS:  That is correct, your Honor.  I would

23  note, your Honor, that the presentence report noted that

24  Mr. Sandoval is ineligible for probation.  I don't think that

25  is correct given the quantities and the fact that there was no

1   great bodily injury out of that.  I did address that in my

2   sentencing memorandum.  I didn't make an official objection out

3   of that, but I did address that in the sentencing memorandum.

4          THE COURT:  I did note that, and we'll talk more about

5   that in just a moment.

6          MR. BERNS:  Thank you.

7          THE COURT:  No formal objections.  Does the government

8   agree that Mr. Sandoval is safety valve eligible, Mr. Rabenn?

9          MR. RABENN:  Yes, your Honor.

10         THE COURT:  All right.  So the safety valve has been

11  applied.  So I'm finding that the total offense level is 13.

12  The criminal history category is I.  That means the guideline

13  range is 12 to 18 months.

14         MR. RABENN:  Your Honor, I would like to just -- so

15  based on the plea agreement, the government has a different

16  calculation than that.  And I think that is that the defense

17  agreed to the same calculation as the government.

18         THE COURT:  So you disagree the offense level is 13?

19         MR. RABENN:  Well, your Honor, and I don't know if

20  there was a secondary -- a revised PSR submitted, but the PSR

21  that I reviewed had the offense -- the adjusted offense level

22  at 15 when including the two levels off for safety valve.  I

23  don't know if Mr. Berns has another opinion on that or if

24  probation does, but my review of the PSR came to that

25  calculation.

1          THE COURT:  I'm sorry.  Is there a presentence report

2     after August 6th of 2020?  I'm looking at the PSR dated

3     August 6th of 2020 filed.

4          MR. RABENN:  Yes.  And I believe that's the one I

5     reviewed and --

6          THE COURT:  And I'm sorry.  So you cut out briefly.

7     What are you saying is the difference?

8          MR. RABENN:  Your Honor, my calculation is an adjusted

9     offense level -- a final adjusted offense level of 15, not 13.

10    But if Mr. Berns or probation disagree with me, I would be

11    happy to be -- stand corrected on that.

12         THE COURT:  Well, how do you get there?  I just noted

13    there were no objections.  I'm looking at the -- the math

14    appears to be correct.

15         MR. RABENN:  So I had a --

16         THE COURT:  So you must in fact object to the

17    guidelines calculation.

18         MR. RABENN:  Right.  Well, so my -- the calculation

19    that I had that was in the plea agreement and I reviewed it

20    last night in the PSR that I thought was what we had agreed to

21    was an offense level of 18 under 2D1.1(c)(11) for at least 40

22    kilograms of converted drug weight, a two-level enhancement for

23    mass marketing, two levels off for safety valve, and then three

24    levels off for acceptance leading to an offense level of 15 and

25    a guideline range of 18 to 24 months with a category I criminal

1    history.

2          THE COURT:  Well, I see that, that that was your best

3    estimate at the time, but it's not binding on the Court or

4    probation or the parties.  So it is not binding on the Court,

5    and so if you didn't object, what the probation officer says in

6    her recommendation is she's done the guidelines calculation

7    based on what she thinks she properly can take account of, but

8    one reason she recommends the high end of the guideline range

9    is because she says there are quantities not embraced by the

10   guidelines calculation.  I understand the government in the

11   plea agreement says it will recommend the low end of the

12   guidelines.

13         MR. RABENN:  That's correct, your Honor.

14         THE COURT:  But the parties' estimate is not binding,

15   even on defendant.

16         MR. RABENN:  Understood, your Honor.  I'm trying to

17   pull up the PSR right now, but my understanding was that

18   probation had agreed to the base offense level of 18.  I'm not

19   sure what the difference in the calculation is.

20         THE COURT:  Well, Officer Slusarenko, can you clarify?

21   Is there an amended PSR?

22         OFFICER SLUSARENKO:  No, your Honor.  There is not an

23   amended PSR.

24         THE COURT:  Can you respond to what Mr. Rabenn is

25   saying?

1          OFFICER SLUSARENKO:  As you know, we were unable to

2   calculate for all of it, so my base offense level for what we

3   were able to calculate for is 16, and that takes into account

4   13.23 kilograms of converted weight for the cocaine and then

5   the 8.76 kilograms converted weight for the marijuana.

6          THE COURT:  So I construe your comments as registering

7   a belated objection, Mr. Rabenn.  I don't know if there's

8   something else you're relying on, but at this point, the time

9   for formal objections has passed.  I don't know if you're

10  requesting additional time to try to sort something out based

11  on a good faith misunderstanding.

12          MR. RABENN:  No, your Honor.  And I'm sorry for

13  interrupting you.  No.  That is fine.  I'm not requesting that.

14  I was more just trying to clarify what the different -- so if I

15  can have one moment just to pull up the section from the PSR

16  just to confirm.  And I apologize, your Honor, for this

17  clarification.  And like I said, if it is -- if it turns out

18  that it is a different calculation, that's fine.  I will not

19  request additional time.  But the PSR that I am looking at,

20  which should be the one that was filed on October 21st, if I'm

21  not mistaken, was the final PSR, states that the base offense

22  level was 6 -- was 18, and so I'm not sure where the change in

23  probation's calculation comes from.  And that would be on page

24  6, paragraph 25 of the PSR.  And if I'm mistaken, I'm happy to

25  stand corrected.  I just want to ensure that I'm reviewing the

1  correct PSR.

2          THE COURT:  I'm not seeing any such PSR on the Court's

3  docket.  It would be sealed, but there's nothing there.  You're

4  saying just last week?

5          MR. RABENN:  Oh, sorry, your Honor.  Your Honor, my

6  apologies.  That would have been from October 21st of 2019.

7          THE COURT:  Oh.

8          MR. RABENN:  That would have been docket number 62.

9  So if there was a subsequent PSR -- if there was an amended PSR

10  that was filed after that, then that is fine, but the one that

11  I am looking at is docket number 62.

12          THE COURT:  Well, that's the draft, and then it looks

13  as if there's a second draft July 14th, 2020, and then the

14  final, docket 77, August 6th, 2020.

15          MR. RABENN:  I see that, your Honor.  So I stand

16  corrected.  That is fine.  The government does not object to

17  that offense level.

18          THE COURT:  All right.

19          All right.  And I don't -- unless I'm faced with

20  formal objections or I have a serious question based on review

21  of the guidelines, it's my independent duty -- of course I

22  appreciate the probation officer's assistance, but ultimately I

23  have to own the calculation.  And here the probation officer

24  did explain -- if you can mute if you're not speaking.  Thank

25  you.  The probation officer explained what she was accounting

1  for and not.

2          So I'm standing by my determination of the guidelines,

3  total offense level 13, criminal history I.  The range is 12 to

4  18.

5          In terms of the -- I think the record is otherwise

6  clear and undisputed, as relevant to the sentencing factors,

7  there's zero criminal history here previously.

8          There was a significant period of time of the sales on

9  the dark web here.  The representation is Mr. Sandoval was

10  motivated by a desire to help his mother who suffered from

11  alcoholism and depression and desired to support his new wife.

12  He acknowledges this was not the right way to do that.

13          He has engaged in programming for his substance abuse

14  issues.  He also indicates part of what motivated him was his

15  own seeking of cocaine and marijuana.

16          There is a characterization of his performance on

17  pretrial release as exceptional.  He is released on conditions,

18  and the record appears to support that.

19          He has not worked since June of 2019, I gather because

20  of the disability.  I would like some clarification on that.

21  Is it the disability continues such that Mr. Sandoval is not

22  able to work, or I understand he lost his last job because of

23  the -- because of the conviction here.

24          So Mr. Berns, can you first clarify for the Court, is

25  he able to find some work notwithstanding the disability he

1    suffered?

2           MR. BERNS:  Your Honor, Mr. Sandoval is still

3    undergoing treatment for -- I guess continuing treatment for a

4    knee injury that includes a torn ACL and a torn meniscus.  I've

5    provided some records of that as well as -- I believe I have,

6    and I know I have certainly.  He does manual labor work, and

7    that is the sort of job that he sustained the injury in and is

8    on disability for and is unable to do that sort of manual labor

9    presumably, and Mr. Sandoval, correct me if I'm wrong, a

10   nonmanual job would be at least theoretically possible, but

11   between this criminal status and Mr. Sandoval's skill set and

12   education level, that's been difficult for him to find.

13          THE COURT:  Mr. Sandoval, anything to add on that

14   front?

15          THE DEFENDANT:  Yes, your Honor.  From my previous

16   doctor's appointment, I was told that there may be a retear in

17   the meniscus, but the ACL is still intact.  My doctor did tell

18   me that if the pain persists, within a month or two, he will

19   have to go in there and fix whatever is going on with my

20   knee.

21          THE COURT:  And are you unable to work now given

22   whatever the doctor says about your disability status?

23          THE DEFENDANT:  I was given a work status of being

24   able to work up to six hours of half the time being standing

25   up, half the time sitting down, but I still have not been able

1   to find a job.  I'm currently still on disability.

2           THE COURT:  Are you providing information to Pretrial

3   Services on efforts to obtain employment?

4           THE DEFENDANT:  Yes, your Honor.  Well, in efforts to

5   obtain employment, no, your Honor, but I have provided

6   information of all the pay stubs to Pretrial as well.

7           THE COURT:  All right.

8           THE DEFENDANT:  And my work status as well.

9           THE COURT:  All right.  Thank you.  You can mute for

10  now.  There is a no alcohol condition proposed.  There's no

11  objection to that?  At least in the past, Mr. Sandoval appears

12  to acknowledge alcohol abuse, and so I'm just noting that would

13  be a condition.  The codefendant is pending sentencing here,

14  correct?

15          MR. BERNS:  First of all, no objection to the no

16  alcohol condition, and second of all, I think Mr. Rabenn can

17  confirm this, but yes, I believe codefendant is pending.

18          MR. RABENN:  Your Honor, the case is pending, but he

19  has not pleaded guilty yet.

20          THE COURT:  All right.  Thank you for that

21  clarification.

22          So I think the real question is given the defense

23  briefing and given what the plea agreement says, is

24  Mr. Sandoval -- is he eligible for probation with a period of

25  home confinement, as a matter of statute and then separately,

1   under the guidelines two separate questions.  And then what is

2   he allowed to request under the plea agreement?  So that's a --

3   I looked at the plea agreement, and so I think those questions

4   are intertwined.  It's not for me to enforce the plea

5   agreement, but I'm just curious what Mr. Rabenn says about

6   that.

7         So first, Mr. Rabenn, is Mr. Sandoval eligible -- put

8   aside the plea agreement for now -- is he eligible for

9   probation?

10        MR. RABENN:  Your Honor, my intention was to defer to

11  probation's determination on whether or not he would be

12  eligible for probation because I do not want to contradict

13  their interpretation of the sentencing guidelines.

14        THE COURT:  And I'm looking at the probation -- the

15  presentence report, page 13, and probation takes the position

16  in 75 and 76 that Mr. Sandoval is ineligible.  And as I

17  understand the defense position, the defense disagrees with

18  that based on the statute.  That's correct, Mr. Berns?

19        MR. BERNS:  Yes, it is, your Honor.  I'm bringing up

20  the statute right now.  But my understanding on this is that

21  there would need to be great bodily injury as a result of

22  Mr. Sandoval's conduct proved to render him statutorily

23  ineligible.

24        THE COURT:  So just so I'm just looking at the

25  statute, and I'm trying to pull up -- it's 21 U.S. Code

1    841(b)(1)(C), correct, the same statute cited by probation?

2           MR. RABENN:  That is correct, your Honor.

3           MR. BERNS:  Yes, your Honor, and I'm looking.  And

4    your Honor, I'm looking at basically the very last three or

5    four lines, two sentences of that statute.

6           THE COURT:  Correct.

7           So Mr. Rabenn, first, as a matter of statute, why does

8    that not provide the possibility of probation here?  Because

9    there's no death or serious bodily injury, correct?

10          MR. RABENN:  That is correct, your Honor.  And the

11   plain language of the statute appears to indicate that.  I

12   haven't seen case law interpreting that, but the plain language

13   appears to support Mr. Berns' contention here.

14          THE COURT:  So then what about the guidelines?  The

15   guidelines are tied to the statute, right?

16          MR. RABENN:  Yes, your Honor.

17          THE COURT:  I'm just going to pull up that language to

18   make certain I'm looking at it which is 5B1.1(b)(2).

19          All right.  It's not simply saying tied to the

20   statute.  It lays out authorization tying it to zones of the

21   sentencing table.  So is there anything in 5B1.1, Mr. Rabenn,

22   that would preclude probation under the sentencing guidelines?

23          MR. RABENN:  I don't think so, your Honor.  As your

24   Honor said, it depends on which zone the applicable offense

25   level falls within, and I think here, if the offense level is

1  13, under the sentencing table, that would put him within zone

2  B.  I just want to confirm that.

3  THE COURT:  The defense memo says zone C -- oh, no,

4  class C felony, right.

5  MR. RABENN:  Class C felony.  But within the table, an

6  offense level of 13 would fall within zone C of the guidelines,

7  and I believe Mr. Berns' argument is that -- right.  So

8  Mr. Berns' argument seems to imply that it should be a zone B,

9  or it could have potentially been had there been a little bit

10  less weight.  But I think all the parties and probation are in

11  agreement that the offense level is in zone C in accordance

12  with the sentencing table.  And then under 5B it states that

13  for an offense that falls within -- I'm trying to pull up

14  the -- under 5B1.1, the guidelines state that probation is

15  authorized if the guideline range is in zone A, or it is in

16  zone B, and the Court imposes a combination.

17  Here, given that it falls within zone C, I do not

18  think that it would fall within what is provided in subsection

19  (a).  So I think under the statute, it would be allowed, but

20  under the guidelines it is not authorized under subsection (a)

21  of 5B1.1.

22  THE COURT:  I think that's fair.  Mr. Berns, agreed,

23  consistent with your argument?

24  MR. BERNS:  That is consistent with my argument.  I

25  think that he does fall -- the adjusted offense level 13, I

1    think we're all in agreement that he would fall into zone C.

2    He's statutorily eligible for probation.  The Court, in

3    ordering probation, would essentially have to find a downward

4    departure, I don't know, into zone B or commensurate with

5    zone B in order to find probation.  That is what I would

6    request.

7              THE COURT:  All right.

8              MR. RABENN:  And your Honor, to dovetail into I think

9    your Honor's third question, which is what does the plea

10   agreement actually provide for in terms of what the defense's

11   ability is to argue for a downward variance or departure, after

12   we entered into the plea agreement, Mr. Berns contacted me and

13   expressed some confusion as to whether or not he would be able

14   to argue for a downward variance or departure.  To avoid any

15   issues of confusion among defense, I wanted the benefit of the

16   confusion to inure to the defendant to avoid any later claims

17   of him not being properly counseled.  And so I did advise

18   Mr. Berns that he could argue for a downward variance, if he

19   did believe that there was some confusion within the language,

20   but I did not -- I still required that the agreement set forth

21   in the plea agreement as to the offense levels be affirmed by

22   Mr. Berns.  So he would not be allowed to ask for any

23   departures but would be able to argue for a downward variance

24   under 3553(a).  And I'm happy to have Mr. Berns confirm that

25   with me, but we've spoken about this several times.

1      THE COURT:  All right.  That's very helpful.  Thank

2  you.

3      So that does -- because it did appear the plea

4  agreement barred the argument.  But given that clarification

5  following the plea, do you agree, Mr. Berns, that your

6  understanding is that you may argue for a variance, which is

7  the Court's reaching a sentence based on the sentencing factors

8  but not a departure.  So the request is not based on a

9  departure provided for by the guidelines, agreed?

10      MR. BERNS:  That's correct.  And to the extent I

11  mentioned departure instead of variance elsewhere, my

12  apologies.  I'm asking for the variance.

13      And then, as it relates to my discussions with

14  Mr. Rabenn, thank you very much, sir, for that clarification.

15  There were portions that seemed that I could not argue for a

16  variance, portions that made it less clear, I believe both on

17  page 8 saying that I could essentially argue for whatever

18  sentence deemed appropriate despite the fact that there are

19  other provisions leaning towards no departure or variance.

20  Therefore, after discussions with Mr. Rabenn, we came to the

21  conclusion that he accurately laid out.

22      THE COURT:  Right.

23      All right.  The only other questions I have is

24  Mr. Sandoval is a legal permanent resident.  He seems to

25  acknowledge this conviction puts his status in this country at

1     risk, but I gather he's not subject to any ICE hold; is that

2     fair, Mr. Rabenn?

3          MR. RABENN:  That's correct, your Honor.  I have

4     not -- to be frank, have not had any discussion whatsoever with

5     ICE about this case.  I have no idea what their plans are.  So

6     I have -- I've steered clear of that.  I have not been

7     contacted, not had any communication with them.  As set forth

8     in the plea agreement, there is certainly a potential that this

9     conviction and/or sentence will jeopardize his status within

10    the country, but I have not had any involvement in whether or

11    not that in fact will occur.

12         THE COURT:  All right.  And this Court doesn't resolve

13    immigration issues.  I mean, if they are out there, the Court

14    assumes that counsel with defendant have addressed that

15    separately.

16         All right.  I don't have any other questions.  So I'd

17    allow brief wrap-up argument.

18         MR. RABENN:  And just to frame what Mr. Berns wants to

19    argue, this might speed things up.  The government, as set

20    forth in the plea agreement, will recommend a sentence at the

21    low end of the applicable guideline range here which would be

22    12 months.  The government requests 12 months and not a year

23    and a day.  I think that that is an extremely beneficial

24    sentence for the defendant given where we started with our plea

25    agreement and the potential quantities that were not included

1    in the guideline calculation.  And so I think 12 months to the

2    day is a sufficient and reasonable sentence for this defendant,

3    so the government recommends 12 months to the day.

4         THE COURT:  All right.  But you would concede -- I'm

5    just testing my options here and looking at paragraph 72,

6    that's actually about the guidelines, not about the statute.

7    But for example, I could impose a sentence of 12 months but six

8    months incarceration, six months supervised release.

9         MR. RABENN:  Your Honor, yes.  I believe, as a

10   variance, your Honor could, yes.  That's correct, your Honor,

11   yes.

12        THE COURT:  Or six months incarceration and 24

13   months -- I mean, there is a three-year term of supervised

14   release here, right?

15        MR. RABENN:  That is correct, your Honor.

16        THE COURT:  Yeah.  All right.

17        All right.  Mr. Berns, anything further?

18        MR. BERNS:  Thank you, your Honor.  First of all,

19   Mr. Sandoval would like to address the Court, but I will give

20   my brief remarks first.  I think I've laid out in the

21   sentencing memorandum Mr. Sandoval, while he was involved in

22   the dark web for some -- not a substantial period of time,

23   looks like a year or more that he was under surveillance, he

24   was always involved as a relatively low-level mule type of -- I

25   guess the capacity of a mule or a low-level employee or

1    something like that.

2              I think, from probation's report plus the safety valve

3    interview that was conducted with Mr. Rabenn, it became fairly

4    apparent that Mr. Lopez was essentially not running the

5    business for himself and running with the wrong people for the

6    wrong reasons.

7              As the Court mentioned at the start of this

8    proceeding, Mr. Sandoval's motivation, as misguided as it was,

9    was to support his family, support his mother, support his

10   young wife.  And essentially because of the fog of drug

11   addiction and the temptation that was present there, he did it

12   absolutely the wrong way.  I think it's very important that the

13   Court note that Mr. Sandoval's motivations have not changed.

14   What has changed is his maturity level, his ability to reflect,

15   for lack of a better term, his clearheadedness now that he has

16   been off drugs for the better part of two years, if not longer,

17   since this arrest, and he now essentially -- he knows that the

18   way to go forward on this, as I've put it in my sentencing

19   memorandum, is to lead a law-abiding life and to not try and go

20   outside the system.

21             I think there's almost no risk of reoffense for

22   Mr. Sandoval because of the lessons he's learned, and I think

23   that those lessons and kind of the principle that reoffense

24   risk is low are both demonstrable by what he's done, including

25   great success at drug rehabilitation, where he's been clean and

1    sober with no issues and really taken advantage of the program,

2    as he's about to talk about, for the past two years.  The fact

3    that he is very close to getting his GED, were it not for

4    COVID, he would probably now have his GED, has been seeking

5    employment, was employed gainfully prior to his injury.

6            I think all those things -- like I said,

7    Mr. Sandoval's motivations have not changed.  What he will do

8    to accomplish those motivations and to accomplish those goals

9    he, I think, fully realizes has to be a 180-degree turnaround

10   from what he was doing when he was involved in this dark web

11   activity, and for the past two-plus years there has been that

12   demonstrable 180-degree turnaround.  That's why I am -- I think

13   his risk for reoffense is very low.  I think that he can be --

14   like I said, he was a low-level employee throughout all this,

15   and I think that a variance is warranted here.  If not full

16   probation then, as the Court suggested, perhaps a period of

17   home confinement as well as a period of incarceration which I

18   think is authorized under the guideline range.

19           One other thing that I would want to note for the

20   Court is that Mr. Sandoval I think was under surveillance for

21   well over a year, Mr. Sandoval along with his partners.

22   Correct me if I'm wrong on the exact length of that, but I

23   believe it was over a year.  And his continued participation in

24   this at the level at which he was -- I just certainly don't

25   want to blame the government's action, but, you know, saying

1  that he was involved in this for a year, saying that he got up

2  to this extensive quantity, the government may have had the

3  ability to stop this much sooner than it did. Of course

4  Mr. Sandoval owns what he did, owns the fact that he did it,

5  and the government has to take care of their -- has to do their

6  investigation properly, but I don't think that it's necessarily

7  proper to say that in a vacuum Mr. Sandoval was on this -- was

8  doing this for, you know, a year before he was caught. I think

9  he was caught well before that, to the extent that that

10 matters.

11        But I think much more important than that is the fact

12 that he has demonstrated the ability, the desire, the

13 motivation, and the actual actions to turn this around and do

14 the 180 that he needs to do in his life.

15        With that, I would submit subject to rebuttal, the

16 Court's questions, and the memorandum submitted.

17        THE COURT: All right. Let me just ask, the

18 government has not presented any alternative narrative in terms

19 of role, Mr. Sandoval's role, and again, the guidelines don't

20 give any enhancement for role. So anything to say in response

21 to the defense narrative?

22        MR. RABENN: No, your Honor. Well, in part. I don't

23 think it's accurate to describe Mr. Sandoval as a mule. I

24 think he -- the facts set forth in the documents that have been

25 filed in this case indicate that he was operating the dark web

1  vendor account.  He was obtaining the narcotics and mailing the

2  narcotics.  So it wasn't as if he was just blindly being handed

3  narcotics that he was then mailing which I think would be more

4  analogous to a mule.  He was operating these accounts with

5  other people.  So I wouldn't have agreed to a role reduction

6  because of that.

7          I would agree that he was also involved with other

8  people who may or may not have been at his same level or

9  higher, but he certainly wasn't just some blind mule doing

10  this.

11          I think Mr. Berns has -- his last argument that

12  somehow the length of this offense was extended by the

13  government's investigation is rather frivolous, and I don't

14  even really want to address it outside of -- I don't have the

15  specific time line in front of me, but it's a rather frivolous

16  argument in that the offense was committed, regardless of

17  whether or not he was under surveillance, and I don't think

18  that in any way should take away from the offense conduct.

19          But in summary, your Honor, he definitely was not a

20  blind mule, but he also wasn't some grand mastermind.  I think

21  he falls squarely within the -- you know, being held

22  accountable for the offenses he committed.

23          THE COURT:  All right.  I understand that position.

24          I'm assuming the offense behavior occurred between

25  August 2017 and October 2018.

1          All right.  Mr. Sandoval, I understand you would like

2     to address the Court, and now is your opportunity.

3          THE DEFENDANT:  Yes, your Honor.  I do have a

4     statement that I would like to give to the Court, if it's okay

5     if I start.

6          Okay.  Most people would say that getting indicted by

7     the feds is a bad thing to happen in your life, and at the

8     beginning, I did feel that way.  However, I now look at it as a

9     positive event changing my life and my wife's life for the

10    better.  I did not get the best start in life.  However, my

11    drug addiction took over my life leading to bad choices and

12    abusing drugs and criminal behavior.

13         I want to thank the Court and pretrial supervision for

14    offering me the opportunity to deal with my addiction and move

15    forward with a positive lifestyle.  I have benefited from all

16    of the different services offered to me, services that I

17    previously was not aware of.  I participated in weekly

18    individual substance abuse counseling which was reduced to two

19    hours a month with my counselor, a retired Sacramento County

20    probation officer, Bill Laron (Phonetic.).

21         All of this has changed my life completely in a very

22    positive way.  It has caused me to look at my life with value,

23    develop better coping skills, and accept responsibility for my

24    actions and center on the important things in my life,

25    particularly my wife, mother, and extended family.

1      I have maintained employment until an on-the-job

2  injury occurred.  I have also been in compliance with pretrial

3  supervision.

4      Now I do regret my actions, particularly the effect

5  that it has had and will have on the people that I love.

6  Regardless of what happens today, I know that I will not go

7  backwards, that I will continue to move forward utilizing the

8  positive skills that I have learned.  Thank you.

9      THE COURT:  All right.  I am prepared to exercise my

10  sentencing authority.  As I said, I've read the statements also

11  attached to defense briefing.  I've reviewed all the

12  information that informs my decision, and really I respect the

13  probation officer's recommendation.  I understand why she's

14  recommending the 18 months.  But I'm starting with the low end

15  of the guidelines.  I think that's the place to start here,

16  given the lack of any criminal history.  It is serious conduct.

17  It doesn't matter that it was conducted on the internet, the

18  dark web.  It doesn't make it less serious.  There were no

19  firearms involved.  However, there was no violence.  I don't

20  find a reason to accept the mule characterization given what's

21  in the factual basis.  On the other hand, it doesn't appear

22  that Mr. Sandoval is a kingpin either.  He's a salesman.  He

23  was a salesman of drugs, and a significant quantity, not all of

24  which are captured by the guidelines.

25      That said, it does appear to the Court that among his

1    motivations was a significant substance abuse problem, and so I

2    do take note of that.  It wasn't the only reason, but it was a

3    part of that and his childhood circumstances could inform that.

4    Although his mother took care of him, an abusive father did

5    abandon the family, it appears, or the mother departed to get

6    away from that father.

7          I give great weight to the exceptional performance.

8    It's -- we expect it, but on the other hand, it's rare to see

9    pretrial services compliance described in the way and with the

10   detail that has been provided regarding Mr. Sandoval's

11   performance on pretrial services release.  And so that

12   demonstrates, in the Court's mind, very significant

13   presentencing rehabilitation which is a factor the Court

14   considers in whether or not to grant a downward variance given

15   the way in which Mr. Sandoval has embraced the programming and

16   is able to articulate the benefit that it's provided to him.

17   That all is consistent with finding that he satisfies that

18   factor.

19         And so I am prepared to vary, but in this way.  I

20   think the 12 months can be accomplished best through a variance

21   that does provide for six months.  I signaled it earlier, but

22   I've thought about it as I've heard you talk.  I think six

23   months incarceration.  So that means a real six months but with

24   a three-year period of supervised release.  So increasing the

25   period of supervised release and with a six-month period of

1   home detention, with Mr. Sandoval to bear the costs of

2   monitoring.

3           Let me ask this.  There is standard language that the

4   Court would impose.  I don't believe it's included on the

5   current list.  And so is Mr. Sandoval consenting to the home

6   detention language without seeing the exact language,

7   Mr. Berns?  It is consistent with your request earlier which is

8   why I ask.

9           MR. BERNS:  I believe that Mr. Sandoval would so

10  consent.

11          Mr. Sandoval, if you can say that you would consent

12  without having seen the exact language in advance to the home

13  detention language, please confirm that.

14          THE COURT:  And let me clarify, Mr. Sandoval.  The

15  home detention language would mean at this point, even with the

16  coronavirus pandemic not suppressed, probation is able to

17  provide for location monitoring, correct, Officer Slusarenko?

18          OFFICER SLUSARENKO:  That is correct, your Honor.

19          THE COURT:  Right.  There are special procedures for

20  arranging for that.  So you would be subject, at the probation

21  officer's direction, to location monitoring, and you would be

22  confined to your residence except as approved in advance by the

23  probation officer.  So it doesn't preclude attending

24  programming, looking for work, but that's, in essence, what the

25  home confinement provision is.

1      So are you prepared to consent to that with the exact

2  language to be included in the judgment and commitment?

3      THE DEFENDANT:  Yes.  I consent, your Honor.

4      THE COURT:  All right.

5      All right.  Therefore, under the Sentencing Reform

6  Act, it's this Court's judgment, Eddy Steven Sandoval Lopez,

7  you are hereby committed to the custody of the Bureau of

8  Prisons to be imprisoned for a term of six months.

9      You shall pay a special assessment of $100.  That

10  payment is due immediately.  I find you don't have the ability

11  to pay a fine.  Imposition of a fine is waived.

12      Upon release, you're placed on supervised release for

13  a term of 36 months.  That will convert to unsupervised release

14  if you are deported, a question on which the Court takes no

15  position.

16      Within 72 hours of release from Bureau of Prisons

17  custody, you shall report in person to the probation office in

18  the district to which you are released.  It's up to you to know

19  that district.

20      While on any supervised or unsupervised release, you

21  shall not commit another federal, state, or local crime, and

22  you shall not illegally possess controlled substances.

23      You shall cooperate in the collection of DNA as

24  directed by probation, and you shall comply with the standard

25  conditions recommended by the U.S. Sentencing Comission.  I'm

1   adopting those.  Those are the conditions 1 through 13 attached

2   to your report.  They are imposed as written.

3        You shall refrain from any unlawful use of a

4   controlled substance.  You shall submit to one drug test within

5   15 days of release and at least two tests thereafter not to

6   exceed four tests per month.

7        I'm imposing the special conditions originally

8   recommended by probation.  They are conditions 1 through 10.

9   They're imposed as written.  They include the direction that

10  you follow all the lawful directives of Immigration and Customs

11  Enforcement officials.

12       I'm also adding as condition number 11 the home

13  confinement condition for a period of six months.

14       Is there a request for a particular institution,

15  Mr. Berns?

16       MR. BERNS:  The nearest to Sacramento which I believe

17  was Lompoc, if I'm not mistaken, but nearest in vicinity to

18  Sacramento would be the request if it can be accommodated.

19       THE COURT:  All right.  I'll recommend that

20  Mr. Sandoval be incarcerated at an institution as close as

21  possible to Sacramento to facilitate family visitation.  He

22  does have close family ties and accepts family

23  responsibilities, that is, insofar as the recommendation

24  accords with security classification and space availability.

25       I'm prepared to include the recommendation that he

1    participate in the Bureau's 500-hour Bureau of Prisons

2    substance abuse treatment program.  I don't know that there

3    will be enough time, but with that recommendation, maybe

4    there's some programming BOP can provide.

5            Any objection to voluntary surrender, Mr. Rabenn?

6            MR. RABENN:  No, your Honor.

7            THE COURT:  What date would we offer currently,

8    Ms. Schultz, for voluntary surrender?

9            THE CLERK:  Your Honor, the default date would be

10   December 28, 2020.

11           THE COURT:  All right.  So having been sentenced,

12   Mr. Sandoval, you shall surrender to the institution designated

13   by the Bureau of Prisons or, if no institution has been

14   designated, to the U.S. Marshal's facility in Sacramento before

15   2:00 p.m. on December 28th of 2020.

16           You're advised it's a criminal offense punishable by a

17   consecutive term of imprisonment to fail to surrender for

18   service of sentence as I've just ordered.

19           All your conditions of pretrial release do remain in

20   effect until you surrender, and so it is important that you

21   report to pretrial services today yet.  I'm ordering you to do

22   that to make certain they know the status and the period of

23   time yet under which you'll be subject to their supervision.

24   Any noncompliance with pretrial release conditions could result

25   in revocation of pretrial release before the end of December.

1          You're dismissing counts, Mr. Rabenn?

2          MR. RABENN:  Yes, your Honor.  The government moves to

3     dismiss the remaining counts in the indictment in the interest

4     of justice.

5          THE COURT:  All right.  That motion is granted.

6          It appears, Mr. Sandoval, that you've given up the

7     right to appeal the sentence just imposed, but if you do wish

8     to file a notice of appeal, you must do so within 14 days of

9     today's date.  If you cannot afford counsel on appeal and

10    request counsel, the Court will appoint counsel for you.

11         Anything else today, Mr. Rabenn?

12         MR. RABENN:  No, your Honor.  Thank you.

13         THE COURT:  Mr. Berns?

14         MR. BERNS:  No.  Thank you very much, your Honor.

15         THE COURT:  Officer Slusarenko, do you have what you

16    need?

17         OFFICER SLUSARENKO:  Yes, I do, your Honor.

18         THE COURT:  All right.

19         All right.  Thank you very much.  You may sign off.

20         THE CLERK:  Court is in recess.

21         (The proceedings adjourned at 12:07 p.m.)

22                          --oOo--

23

24

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3                              /s/ Kacy Parker Barajas

4                              _____
                               KACY PARKER BARAJAS
                               CSR No. 10915, RMR, CRR, CRC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25